IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE SOUTHERN NEW ENGLAND           :
TELEPHONE COMPANY,                 :
                                   :
            Plaintiff,             :
                                   :       CIVIL ACTION NO.
vs.                                :
                                   :       1:08-CV-3816-CC
1003 DONNELLY AVENUE, INC.;        :
GLOBAL NAPS, INC.; GLOBAL NAPS     :       **UNDER SEAL**[1]
NEW HAMPSHIRE, INC.; GLOBAL        :
NAPS NETWORKS, INC.; GLOBAL        :
NAPS REALTY, INC.; and FERROUS     :
MINER HOLDINGS, LTD.,              :
                                   :
            Defendants.            :

## ORDER

This matter is presently before the Court on Plaintiff SNET's Motion for Summary Judgment [Doc. No. 52] and The Southern New England Telephone Company's Motion for Leave to Supplement Its Summary Judgment Papers [Doc. No. 71]. As an initial matter, insofar as Defendants have filed a response indication that they do not oppose the supplemental briefing filed by Plaintiff, the Court will consider such briefing in connection with its summary judgment ruling. As to the summary judgment motion, the Court concludes that it is due to be granted, for the reasons stated below.

## I.   RELEVANT UNDISPUTED FACTS

In December 2004, Plaintiff The Southern New England Telephone Company ("SNET") brought suit against Global NAPs, Inc. ("Global Inc.") in the United States District Court for the District of Connecticut, alleging that Global Inc. owed SNET millions of dollars in unpaid federal tariff charges for telecommunications services.

---

[1] The Court instructs the parties to confer and file a redacted version of this Order for public viewing within the next twenty (20) days.

In May 2006, the Connecticut court granted SNET a prejudgment remedy in the amount of $5.25 million and ordered Global Inc. to either post bond or disclose information concerning its assets in an amount sufficient to satisfy the prejudgment remedy. SNET deposed Richard Gangi, Global Inc.'s treasurer (now deceased), regarding its corporate assets. He testified that Global Inc. did not have sufficient assets to satisfy the $5.25 million prejudgment remedy and that Global Inc. had transferred all of its equipment with any value to another Global entity called Global NAPs Networks, Inc. ("Global Networks") without compensation or documentation. Mr. Gangi further testified that Global Inc.'s customer contracts had been assigned after one year to Global Networks without compensation or documentation.

SNET amended its complaint in the Connecticut action to name as defendants Global NAPs Realty ("Global Realty"), Global NAPs New Hampshire, Inc. ("Global New Hampshire"), Global Networks, and Ferrous Miner Holdings, Ltd. ("Ferrous Miner"), alleging that the aforementioned entities were mere alter egos of Global Inc. and seeking to hold them liable for the debts of Global Inc. On July 1, 2008, the Connecticut court entered default judgment against all defendants for more than $5.8 million, jointly and severally. SNET registered its judgment in this Court and brought the instant case in 2008 seeking to set aside what it contends is a fraudulent conveyance of real property located at 1003 Donnelly Avenue, Atlanta, Georgia (the "Property"), from Global Realty to Defendant 1003 Donnelly Avenue, Inc. ("1003 Donnelly").

Defendant Ferrous Miner is a holding company and sole shareholder of the defendant Global NAPs entities. Frank T. Gangi is the sole shareholder of 1003 Donnelly. Ferrous Miner has its principal offices at 10 Merrymount, Quincy, Massachusetts. The defendant Global NAPs, including Global Realty, are wholly owned subsidiaries of Ferrous Miner and also have principal offices at 10

Merrymount.  Frank Gangi is the sole shareholder, officer, and director of Ferrous Miner.  Frank Gangi is the president, a director, and ultimate shareholder of all the Global NAPs companies.  Michael Couture, Frank Gangi's brother-in-law, is the only other current officer and/or director of the companies bearing a Global NAPs name and of 1003 Donnelly.  Frank Gangi has served as Global Realty's president since its inception, and has also served as a director and officer of Global Realty. Michael Couture is the only other officer and/or director of Global Realty.  Prior to his death, Richard Gangi also served as an officer and director of Global Realty.

Global Networks and Global Inc. are engaged in the business of providing telecommunications infrastructure to VOIP and internet service providers.  Global Realty oversees real estate operations for the Global NAPs companies and leases properties used by the Global NAPs enterprise in the conduct of its telecommunications business.  Global Realty is typically the tenant in these transactions.  In 2005, Global Realty was obligated to pay between $100,000 and $200,000 per month in rental payments.  Global Realty apparently also leases space to third-party customers who sublease rack space for telecommunications equipment in property leased to Global Realty, but Frank Gangi, testifying as its corporate representative, could not specify how many customers, guessing that it was less than 100.  He did not know the amount of revenue represented by customers in 2005.  Global Realty has no documents that would identify its customers other than invoices that were sent to them; however, Frank Gangi did not know if the invoices were retained.  In April 2007, Global Realty issued Consents of Stockholder and Consent of Directors that approved actions take by Global Realty in 1997 through 2006, even though the actions approved had occurred years prior. Michael Couture testified that they weren't doing a good job with the paperwork.

1003 Donnelly was incorporated in 2002, using funds provided personally by

Frank Gangi. Frank Gangi is the sole shareholder and has served as the president and sole director since 1003 Donnelly's inception. 1003 Donnelly is headquartered at 10 Merrymount. 1003 Donnelly's board of directors holds meetings on an annual basis. The board does not generate minutes for its meetings but instead generates ratifications. Like with Global Realty, these ratifications were memorialized in writing several years after the fact. Michael Couture is the only other officer of 1003 Donnelly and has served as secretary since 2002. Richard Gangi served as an officer prior to his death in 2007. 1003 Donnelly has no business operations other than its ownership of the Property and has no other assets. 1003 Donnelly has no cash, income, or revenues. It has no bank account and has never had one. Neither 1003 Donnelly nor Global Realty file federal tax returns; rather, Ferrous Miner files a consolidated return on behalf of all entities.

Before 2006, none of the Global entities kept separate financial records. Instead, all assets and liabilities were commingled, and the separate entities were treated as one larger entity with no attempt at separation. When Richard Gangi testified in 2006, he stated that he was not provided and had never seen financial statements for any of the Global NAPs entities because all the companies were subsidiaries of Ferrous Miner and Ferrous Miner generated financial statements. Michael Couture has never reviewed any type of financial documents related to Global Realty, 1003 Donnelly, or any Global NAPs entity because he relied on Frank and Richard Gangi.

In September 2000, Global Realty acquired the Property for $812,500. Frank Gangi testified that Global Realty bought the Property because he wanted it to and that there were plans to expand into Atlanta. At the time of purchase, the Property was a warehouse-sized building of approximately 30,000 square feet with several

offices and a paved parking area.[2]  Global Realty and the other Global NAPs entities used this building to house telecommunications equipment.  According to Frank Gangi, the Property was rented to his various Global NAPs companies through a limited liability corporation in the Virgin Islands called BABP(VI), LLC ("BABP").  Frank Gangi was the sole owner of BABP, which is no longer in existence.  When it was in operation, BABP charged the Global NAPs companies for a package of goods and services (management fees), which included the use of the Property.  All expenses related to the Property were the responsibility of the parties using it.  Although rented by BABP to the Global entities, Frank Gangi still ultimately owned the Property.  The arrangement and understanding between BABP and the Global NAPs entities was a verbal understanding.  There were no written agreements.  As Frank Gangi explained, this arrangement was put into place by custom and practice and by negotiation between he and his brother.  It covers taxes on the Property, maintenance, and insurance.  In addition to storing telecommunications equipment,

---

[2] Defendants argue that this fact should not be considered because the email on which Plaintiff relies to support this statement has not been authenticated.  The Eleventh Circuit has held that "[t]o be admissible in support of or in opposition to a motion for summary judgment, a document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."  Saunders v. Emory Healthcare, Inc., 360 Fed. Appx. 110, 113 (11th Cir. 2010).  However, it is permissible to consider evidence in an inadmissible form at the summary judgment stage where it is otherwise admissible.  McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996) (noting that the evidence must be submitted in admissible form at trial).  In the instant case, as in Dubai World Corp. v. Jaubert, No. 09-143314-CIV, 2011 U.S. Dist. LEXIS 12554 (S.D. Fla. Feb. 9, 2011), there is no argument that the email cannot be authenticated; instead, Defendants emphasize Plaintiff's failure to authenticate it.  The Court concludes that it is proper to consider this evidence, and other similar evidence that is referenced in Plaintiff's statement of facts and relied on in this factual summary, because the Court finds that it could be admissible at trial.  See United States ex rel. WFI Ga., Inc. v. Gray Ins. Co., 701 F. Supp. 2d 1320, 1332-33 (N.D. Ga. 2010).

the Property also was used to house several racks on which approximately 10-20 third-party customers paid to place their communications equipment. The property was managed and overseen by Tim Durrigan, who was employed by Global Networks.

Within approximately one year from the 2000 purchase of the Property, Global Inc., Global Realty, or Global Networks (or whoever was using the space at the time) made improvements to the Property, including (1) finishing the walls and floors; (2) dividing the space into three large rooms; (3) installing two new bathrooms, an electrical room, and a loading dock; (4) adding a new roof; (5) installing three rooftop HVAC units; (6) re-paving the parking lot; (7) installing a security fence and gate; (8) installing a 800 KW generator; and (9) installing a new pointed brick exterior. Frank Gangi did not recall the specific improvements that were made, other than it being painted and cleaned up.

On April 26, 2005, Global Realty transferred the Property to 1003 Donnelly by warranty deed, which was recorded. Richard and Frank Gangi represented the seller and buyer, respectively. Neither party performed a formal appraisal of the property's worth at the time of conveyance. 1003 Donnelly did not conduct a title search prior to the conveyance. Richard and Frank Gangi determined to transfer the Property and at what value. Frank Gangi never saw any written documentation reflecting the appraised value of the Property. 1003 Donnelly did not conduct any independent review of what the Property was worth. A Consent of Directors dated April 25, 2005 reflects that Frank T. Gangi, as 1003 Donnelly's sole director, consented to 1003 Donnelly's purchase of the Property for $825,000, $12,500 more than when it was first acquired by Global Realty in 2000. The Fulton County Board of Assessors' appraised value almost doubled during the period between 2000 and 2005, increasing from $373,300 to $760,700. In 2009, the Property was appraised at

$2.826 million.

1003 Donnelly did not purchase the property from Global Realty with cash or transfer any funds to Global Realty. Instead, 1003 Donnelly received the Property in exchange for agreeing to take on $825,000 of debt that Global Realty owed to Frank Gangi. Frank Gangi testified that, in effect, he "advanced new money to [1003] Donnelly, [1003] Donnelly then gave that money to [Global] Realty, [Global] Realty then paid me back." Further, "One could also say that I simply moved the debt over here to over there." 1003 Donnelly's interrogatory responses state the following: "In exchange for the Property, 1003 Donnelly's owner, Frank Gangi, reduced the amount of money [Global] Realty's parent company, Ferrous Miner, owed to him by $825,000." When asked who initially owed him money, Frank Gangi testified that it was a matter of perception and that he looks at all the companies as owing him money. According to Frank Gangi, both explanations are correct.

There is no documentation regarding the debt transfer. Frank Gangi testified that he simply understands what is needed and what should be done. Michael Couture testified that he can't remember the consideration for the Property. Neither Frank Gangi nor Michael Couture recalled any discussions on behalf of 1003 Donnelly as to whether it should accept the property in exchange for taking on the loan. There are no documents that would reflect such discussions. Frank Gangi testified that he decided, on behalf of 1003 Donnelly, that Donnelly should acquire the property in exchange for taking on the debt. There are no written loan agreements, and 1003 Donnelly has not recorded interest expense in connection with the transfer. In his testimony, Frank Gangi states that 1003 Donnelly will pay the loan either when Frank Gangi calls the note or when the property is sold, and that the note is a balloon note with interest accruing to the principal. No documents

reflect this agreement, and there is no promissory note.  1003 Donnelly has no revenues, no assets other than the Property, no business operations, and no income; therefore, it has no ability to repay the loan other than by selling the Property.  Frank Gangi testified that the Property was transferred in 2005 for liability reasons, so that no one could slip in a different facility, sue, and take away the Property.  Michael Couture, 1003 Donnelly's secretary and only other officer, testified that he can't recall why the Property was transferred.

By May 2006, according to Frank Gangi, the Global NAPs companies were "being sued by everybody."  Global Realty did not keep any accounting records or retain copies of financial records.  No documents reflecting a bank account in Global Realty's name were produced during the discovery period, although Frank Gangi testified that he believed, but did not know for sure, that Global Realty had a bank account at the time of the conveyance.  Frank Gangi, testifying as Global Realty's corporate representative, could not provide specific information about assets that Global Realty had on the date of the conveyance and did not know whether Global Realty's revenue exceeded its expenses in 2005.  Frank Gangi believed Global Realty was profitable because his brother Richard Gangi would have told him if it were not.  Global Realty does not maintain any documents to track its assets.  The 2005 consolidated tax return of Ferrous Miner, of which Global Realty is a part, showed an ordinary business loss of just over $500,000.  According to a December 31, 2006, adjusted trial balance, Global Realty had total assets of $825,563 and total liabilities of $1.3 million, for a total negative equity of $542,321.  The same document shows that Global Realty's expenses, $607,321, far exceeded its total revenues, $65,000.  Frank Gangi, testifying as corporate representative, stated that he did not know whether Global Realty's revenues exceeded its expenses in 2005, but that no one is complaining about Global Realty not paying for services.  A July 2006 e-mail from

the Chief Financial Officer of the Global NAPs entities identifies Global Realty as a smaller company that currently shows losses but notes that, in the future, it might be best to show some profits in the entity to demonstrate that it is commercially reasonable.

Global Realty owned three pieces of real property, all of which it transferred to affiliated entities during an 11-month time span in 2004 and 2005. Prior to these transfers, in 2002, Global Realty's Board of Directors had authorized the creation of single-purpose entities to which Global Realty could sell its real estate, to protect those properties from liability for claims arising out of the use of another property. In April 2005, Global Realty transferred the Property to 1003 Donnelly. A few months earlier, in December 2004, Global Realty transferred a building in Massachusetts to an entity called 1120 Hancock Street, Inc., which is wholly owned by Ferrous Miner, but Frank Gangi testified that he continued to hold as a corporate shell. Less than a year after the transfer of the Property, Global Realty transferred its last piece of property, a vacant lot in Las Vegas, Nevada, to an entity called Sahara and Arden, Inc., which is wholly owned by Ferrous Miner. Following the conveyance of the Property to 1003 Donnelly in April 2005, the use of the Property did not change. Global Realty and the other Global entities had an informal arrangement with 1003 Donnelly that allowed them to continue to use the building space. There was no lease or other documentation. According to Frank Gangi, at some point, the operations at the building were terminated and the Property is currently used to store unused equipment. However, Michael Couture testified that, although there is no telecommunications traffic going through the building, there is some internet protocol type of traffic going through there. Any maintenance of the Property is performed by employees of Global Inc. or Global Networks but not by 1003 Donnelly employees. After the conveyance, the Property continued to be

managed and overseen by Tim Durrigan, who was employed by Global Networks. Michael Couture also identified a switch technician or contractor who worked at the Property after the conveyance but was employed by one of the Global NAPs companies and not by 1003 Donnelly.  Frank Gangi, testifying as corporate representative, did not know on which entity's accounting records the Property is reflected, if any.  Both 2005 and 2006 trial balance reports reflect that the Property was included as an asset of Global Inc. and valued at $1.137 million.  The Global Inc. 2005 General Ledger lists the value of the Property as $1.137 million.  Ferrous Miner's 2006 Georgia tax return lists a building in Georgia valued at $1.37 million.

After the transfer, BABP continued to manage the Property with the same informal, unwritten arrangement as before.  When BABP was dissolved in 2005 or 2006, the individual Global NAPs entities that used the Property continued to pay directly for expenses associated with the Property.  1003 Donnelly did not and does not make any such payments.  After the conveyance, property taxes for the Property continued to be paid by either Global Networks or Global Realty but not by 1003 Donnelly.  Other invoices and billing relating to maintenance and use of the Property, such as for lawn care, water, and disposal services, also continued to be paid by the various Global entities using the Property and not by 1003 Donnelly. Currently, the insurance policy for the Property is being paid by the Global NAPs entities and not by 1003 Donnelly.  1003 Donnelly does not pay the invoices or bills related to the Property.  According to Frank Gangi, from Global Realty's perspective, the only thing that changed after the conveyance was the name of the landlord in terms of the lease/rental agreements.

Currently, the Global NAPs entities, including Global Realty, are forbidden from transferring any assets without the approval of a court-appointed monitor. The monitor was appointed after the United States District Court for the District of

Massachusetts found that Global Realty, Ferrous Miner, Global NAPs New Hampshire, Inc., Global Networks, and Frank Gangi had transferred funds in violation of court orders for the purpose of hiding assets from creditors.  In the instant lawsuit, SNET asserts a claim for fraudulent transfer and seeks to have the conveyance of the Property to 1003 Donnelly set aside.  SNET also seeks a writ of execution allowing it to execute on the Property to satisfy the outstanding judgment.

## II.    STANDARD OF REVIEW

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  When the movant would bear the burden of proof at trial, the movant "must show affirmatively the absence of a genuine issue of material fact." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)).  The movant "must show that, on all essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  Id.  If the moving party fails to make this showing, then the motion must be denied and the court need not consider the non-movant's response to the summary judgment motion. Fitzpatrick, 2 F.3d at 1116.

If, however, the movant satisfies this initial burden, the non-movant must "come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact."  Id.  The non-movant may not "rest upon the mere allegations or denials of the [non-movant's] pleading, but the . . . response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). Summary judgment should be granted only when, considering the combined body

of evidence, no reasonable juror could find for the non-movant.

## III.   ANALYSIS

The only claim at issue in this case in SNET's claim that the conveyance of the

Property was a fraudulent transfer.  The Georgia Uniform Fraudulent Transfer Act

provides as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to
> a creditor, whether the creditor's claim arose before or after the transfer
> was made or the obligation was incurred, if the debtor made the
> transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the
> debtor; or
>
> (2) Without receiving a reasonably equivalent value in exchange for the
> transfer or obligation, and the debtor:
>
>> (A) Was engaged or was about to engage in a business or a
>> transaction for which the remaining assets of the debtor were
>> unreasonably small in relation to the business or transaction; or
>>
>> (B) Intended to incur, or reasonably should have believed that he
>> or she would incur, debts beyond his or her ability to pay as they
>> became due.

O.C.G.A. § 18-2-74(a).[3]  The statute lists non-exclusive factors, or badges of fraud,

that may be considered when determining actual intent:

(1)   The transfer or obligation was to an insider;

(2)   The debtor retained possession or control of the property
transferred after the transfer;

(3)   The transfer or obligation was disclosed or concealed;

(4)   Before the transfer was made or obligation was incurred, the
debtor had been sued or threatened with suit;

(5)   The transfer was of substantially all of the debtor's assets;

(6)   The debtor absconded;

---

[3] The Court agrees with Plaintiff's position that decisions from other jurisdictions
that interpret the same uniform statutory language may be persuasive.  See Jenkins v.
Garrison, 265 Ga. 42, 46 n.8, 453 S.E.2d 698 (1995).

 (7)  The debtor removed or concealed assets;

 (8)  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

 (9)  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

 (10)  The transfer occurred shortly before or shortly after a substantial debt was incurred; and

 (11)  The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

O.C.G.A. § 18-2-74(b).  "[A] single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance; but several of them considered together may form a basis to infer fraud."  Tindall v. H & S Homes, LLC, No. 5:10-cv-044(CAR), 2011 U.S. Dist. LEXIS 2299, *18-19 (M.D. Ga. Jan. 10, 2011).  Plaintiff argues that these factors establish that the transfer was fraudulent.

 The Court first considers whether the Property was transferred to an insider. An corporate insider is defined as a director, officer, or person in control of the corporate debtor or an affiliate or insider of an affiliate.  O.C.G.A. § 18-2-71(7).  An affiliate, in turn, means "[a] person who directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . " or "[a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote by the debtor or a person who directly or indirectly owns, controls, or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor . . . ."  § 18-2-71(1).  Global Realty is a wholly owned subsidiary of Ferrous Miner, which is solely owned and directed by Frank Gangi.  The sole shareholder of 1003 Donnelly is Frank Gangi.  The Court concludes that 1003 Donnelly is an insider of

Global Realty because both entities are owned, directly or indirectly, by Frank Gangi. See Otero v. Vito, No. 5:07-cv-405 (CAR), 2009 U.S. Dist. LEXIS 86638 (M.D. Ga. Sept. 22, 2009).

The Court next considers whether Global Realty retained possession of the Property after it was transferred to 1003 Donnelly. The undisputed facts establish that, following the conveyance of the Property to 1003 Donnelly, the use of the Property did not change. Global Realty and the other Global entities had an informal arrangement with 1003 Donnelly that allowed them to continue using the Property. No lease or other documentation exists, and there does not appear to be evidence that lease payments were ever made to 1003 Donnelly. The Property was managed and overseen by the same individual before and after the transfer. These facts, together with the other undisputed facts set forth above, establish that the continuous use of the property, the maintenance of the property, and the arrangement with the Global entities, support a finding of fraud in this case. Nothing about the Property or its used changed after the transfer to 1003 Donnelly, and the Property was never maintained by 1003 Donnelly.

The transfer of the Property was by warranty deed, and the warranty deed was recorded. Plaintiff contends that, nonetheless, the formal documentation did not reflect the true circumstances of the transfer and cites In re Prosser, 2009 Bankr. LEXIS 3279, 2009 WL 3270765 (Bankr. D.V.I. Oct. 9, 2009). The Prosser court considered the same badges of fraud cited by the Georgia statute applicable here, including the issue of whether the transfer was concealed or disclosed. In Prosser, the court found that the transaction at issue was not discussed with or approved by the board of the transferor, that the board members were provided with false information regarding the transfer, and that the financial statements did not properly reflect the transaction. Notwithstanding that the deed reflecting the

transfer was recorded, the court found that "the creditors did not have access to the circumstances surrounding the transfer" and "sufficient information was not disclosed anywhere that would put creditors on notice of the fraudulent nature of the transaction." Id. at *44-45. Plaintiff argues that the deed recorded in this case does not describe the transaction's consideration. The Court has reviewed the warranty deed and finds that it states that the Property was transferred in consideration of $825,000. While the deed does not state that the transfer simply moved the debt from one entity to another, Plaintiff does not explain whether this is typical practice for a warranty deed where the transaction includes the assumption of an alleged debt and does not identify the documents that should have been filed or otherwise available for public disclosure of the nature of this transaction. The Court therefore is not persuaded that the transfer was concealed within the meaning of the fraudulent transfer statute.

The Court next reviews lawsuits or threatened lawsuits against Global Realty prior to the transfer, which occurred on April 26, 2005. Frank Gangi testified that, by May 2006, the Global entities were being sued by everybody. The underlying judgment that forms the basis for the instant lawsuit arises out of a multi-million dollar lawsuit that was filed in December 2004. Global Realty was not added as a defendant in that action until June 2006. Considering the later finding that Global Realty was an alter ego of the corporate entity sued in December 2004, however, the Court concludes that the 2004 lawsuit put Global Realty on notice, along with the other alter-ego Global entities, of the potential for a multi-million dollar judgment. See The Southern New England Telephone Co. v. Sahara & Arden, Inc., 2:09-CV-00534-RCJ-PAL, 2010 U.S. Dist. LEXIS 51178 (D. Nev. May 24, 2010). The Court finds this badge of fraud to be satisfied.

The Court turns to the question of whether the Property constituted

- 15 -

substantially all of Global Realty's assets.  As the Court previously found, Global Realty did not keep accounting records or retain copies of financial records during the relevant time period.  No documents reflecting a bank account in Global Realty's name were produced during the discovery period.  Frank Gangi, as Global Realty's corporate representative could not provide specific information about assets that Global Realty had on the date the Property was transferred.  He did not know if Global Realty's revenue exceeded its expenses in 2005.  Global Realty does not maintain any documents to track its assets.  The 2005 consolidated tax return of Ferrous Miner showed an ordinary business loss of over $500,000.  According to a December 31, 2006 adjusted trial balance, Global Realty's liabilities exceeded its assets and its expenses exceeded its revenues.  Global Realty owned three pieces of property, including the Property at issue here, and it transferred all three properties to new entities during 2004 and 2005.  The Property was the second to be transferred.  Subsequent to the transfer of the Property, Global Realty transferred a vacant lot in Las Vegas to a new entity.  Because the undisputed facts set forth by Plaintiff does not establish the value of the vacant lot in Las Vegas, the Court lacks sufficient information to determine if the Property at issue here was substantially all of Global Realty's assets.  At the time of the conveyance, Global Realty did not have any assets left other than the two properties.

The eighth factor, the value of consideration received, supports Plaintiff's position that the transfer was fraudulent.  1003 Donnelly did not purchase the Property from Global Realty with cash; instead, 1003 Donnelly received the Property in exchange for agreeing to take on $825,000 of debt that Global Realty owed to Frank Gangi.  However, no loan documents for either transaction appear to exist, and no monthly interest or principal payments were made by 1003 Donnelly. Similarly, there is no evidence that any payments were made by Global Realty.

Frank Gangi testified that he simply moved the debt from one entity to another. No formal appraisal of the Property's value was done. The Property was simply transferred from one entity to another. There is no evidence of an existing loan that could have been taken over by 1003 Donnelly. 1003 Donnelly does not have income or business operations and has no way to pay the loan, other than by selling the Property. While the satisfaction of an existing debt may be constitute adequate consideration, the record does not reflect any evidence of the existence of the debt, beyond Frank Gangi's testimony. No appraisal of the Property was done to determine its fair market value at the time of the transfer. The only consideration received by Global Realty for the transfer of the Property is the cancellation or transfer of an undocumented alleged debt that it owed to Frank Gangi, a debt as to which it had made no payments and had no agreed upon interest rate. Although the transfer was purportedly conveyed for $12,500 more than its purchase price five year's prior, the appraised value of the Property for tax purposes nearly doubled during this same time period. Additionally, improvements to the Property, including finishing walls and floors, installing two new bathrooms, installing three HVAC units, and installing a new brick exterior, had been made during this time. Under these circumstances, the Court concludes that this transaction was lacking in adequate consideration as a matter of law. See Truong v. Kartzman, No. 1:06-5511(GEB), 2007 U.S. Dist. LEXIS 48614 (D. N.J. July 5, 2007); In re Nat'l Audit Defense Network, 367 B.R. 207, 225-26 (D. Nev. 2007); Swinford v. Teegarden, 60 S.W. 1089, 1091 (Mo. 1901).

The Court next questions whether Global Realty was insolvent shortly before or after the transfer of the Property. An entity is insolvent if "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." O.C.G.A. § 18-2-72(a). The Property was transferred in April 2005. Global Realty did not file a

separate tax return that year, and there is no evidence of any separate financial statements or other accounting records. The 2005 consolidated tax return of Ferrous Miner showed an ordinary business loss of over $500,000. According to a December 31, 2006 adjusted trial balance, Global Realty's liabilities substantially exceeded its assets and its expenses exceeded its revenues. Global Realty had assets of $825,563 and liabilities in the total amount of $1.3 million, and expenses of $607,321 with revenues of $65,000. The Court concludes that, based on the only information available, Global Realty was insolvent shortly before and after the conveyance at issue here.

The Court additionally evaluates whether the transferred occurred shortly before or after Global Realty incurred a substantial debt. The Property was transferred in April 2005. The underlying $5.25 million judgment was entered in May 2006. While Plaintiff has filed some documents indicating that Defendant Global Inc. was subject to a $250,000 pre-judgment obligation in December 2004, the case appears to have been resolved by settlement, and the Court has no further information regarding the amount of settlement or the status of the $250,000 obligation in light of the settlement. The Court has been provided with no other information indicating that Global Realty incurred a substantial debt shortly before or after the transfer at issue here.[4] The Court, therefore, cannot find this badge of fraud to exist as a matter of law.

Plaintiff argues that this case is "rife" with badges of fraud and that the

---

[4] Plaintiff's statement of facts indicates that the Global NAPs defendants were subject to a $1.1 million court-ordered remittitur in March 2005 secured by Frank Gangi's former housekeeper; however, Plaintiff does not cite to any record evidence in support of this fact and has not attached any documentation reflecting the remittitur to its motion for summary judgment. The Court does not have remote access to the Massachusetts Superior Court's docket. Accordingly, the Court will not consider this fact.

burden shifts to Defendants to come forward with evidence indicating that they did not actually intend to defraud. Defendants, however, question whether such burden shifting is appropriate. This precise issue was aptly discussed by Judge J. Owen Forrester in <u>Kipperman v. Onex Corp.</u>, No. 1:05-cv-01242-JOF, 2010 U.S. Dist. LEXIS 18669 (N.D. Ga. Mar. 2, 2010). After reviewing Georgia's Uniform Fraudulent Transfer Act (adopted July 1, 2002), Georgia's prior law on fraudulent conveyances, and the commentary accompanying the Uniform Fraudulent Transfer Act, Judge Forrester indicated that most states have declined to carry over the common law burden-shifting approach in fraudulent conveyance cases after adopting the Uniform Fraudulent Transfer Act. The Court's own research, however, has identified a number of cases applying a burden-shifting approach to the Uniform Fraudulent Transfer Act or indicating that the burden shifts under certain circumstances. <u>See, e.g.</u>, <u>In re Fisher</u>, 296 Fed. Appx. 494, 501-02 (6th Cir. 2008); <u>Hartford Fire Ins. Co. v. CMC Construction Co.</u>, No. 3:06-CV-11, 2010 U.S. Dist. LEXIS 86826, *60-62 (E.D. Tenn. Aug. 24, 2010); <u>Sahara & Arden</u>, 2010 U.S. Dist. LEXIS 51178, *27; <u>United States v. Bigalk</u>, 654 F. Supp. 2d 983, 991 (D. Minn. 2009); <u>United States v. Smith</u>, No. 1:99-cv-974-TSH, 2008 U.S. Dist. LEXIS 96869, *14 (S.D. Ohio Nov. 19, 2008).

In the instant case, although the Court finds Judge Forrester's discussion instructive and persuasive, the Court need not determine whether burden shifting still applies under Georgia law after the adoption of the Uniform Fraudulent Transfer Act. Whether the Court concludes that the evidence establishes an inference of fraudulent intent and shifts the burden to Defendants or that the factors themselves establish fraudulent intent as a matter of law, the Court would still find

for Plaintiff in this case.[5]  The badges of fraud discussed above, along with all the other facts and circumstances reviewed by the Court, establish that the transfer of the Property to a shell entity owned by Frank Gangi in exchange for the assumption of an undocumented debt lacking in specific terms and having no regular payment obligation of interest or principal at a time when a multi-million dollar lawsuit was pending against one of Global Realty's alter ego companies is actually fraudulent as a matter of law.

Finally, even if the Court were to find a genuine issue of material fact on the question of actual intent to defraud, the Court would find that summary judgment is due to be granted because the transfer was constructively fraudulent, for the reasons stated by Plaintiff.

## IV.    CONCLUSION

For the reasons stated above and for the other reasons stated by Plaintiff that are consistent with this Order, the Court **GRANTS** Plaintiff SNET's Motion for Summary Judgment [Doc. No. 52] and The Southern New England Telephone Company's Motion for Leave to Supplement Its Summary Judgment Papers [Doc. No. 71].

The transfer of the Property from Global Realty to 1003 Donnelly is hereby set aside as a fraudulent conveyance, and this Order shall serve as a writ of execution against the Property in favor of Plaintiff.

The Clerk of Court is **INSTRUCTED** to close this case.


SO ORDERED this 31st day of March, 2011.

---

[5] In any event, pursuant to the summary judgment standard discussed above, Defendants are obligated to come forward with evidence sufficient to call into question the inference created by Plaintiff's evidence.  Defendants have failed to meet this obligation here.

_s/   CLARENCE COOPER_

CLARENCE COOPER
SENIOR UNITED STATES DISTRICT JUDGE